# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

Assigned on Briefs September 18, 2012

## STATE OF TENNESSEE v. KACY DEWAYNE CANNON

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 243913      Rebecca Stern, Judge**

---

**No. E2011-02624-CCA-R3-CD - Filed December 5, 2012**

---

A Hamilton County jury convicted the Defendant, Kacy Dewayne Cannon, of aggravated rape, and the trial court sentenced him as a Range II offender to thirty-five years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the trial court erred when it admitted a TBI report detailing the DNA on substances found on the victim's pantyhose; (2) the trial court erred when it denied his motion to dismiss the case after the victim died; (3) the trial court erred when it denied his request for a forensic scientist to testify about the procedure for handling evidence and the possibility of evidence contamination; (4) the State failed to establish a sufficient chain of custody for the victim's pantyhose; (5) the trial court erred when it allowed the State to introduce testimony about the emergency room's protocol; (6) a State witness, Nurse Ardyce Ridolpho, was not qualified to testify as an expert; (7) the trial court erred when it determined that the State did not commit prosecutorial misconduct during closing arguments; (8) the trial court erred when it allowed a doctor to testify about the victim's medical records; and (9) he is entitled to relief based upon cumulative error. After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Ardena J. Garth; District Public Defender; and Richard Kenneth Mabee, Assistant District Public Defender, Chattanooga, Tennessee, for the appellant, Kacy Dewayne Cannon.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William H. Cox, III, District Attorney General; and Boyd M. Patterson, Jr., Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

**I. Facts and Procedural History**

This case arises from the Defendant's second trial on the charge of the aggravated rape of the victim on November 18, 1999. The Defendant's first trial resulted in a conviction, which this Court affirmed, remanding the case for resentencing. *State v. Kacy Dewayne Cannon*, No. E2005-01237-CCA-R3-CD, 2006 WL 3787915 (Tenn. Crim. App., at Knoxville, Dec. 27, 2006), *rev'd by State v. Cannon*, 254 S.W.3d 287, 287 (Tenn. 2008). The Tennessee Supreme Court granted the Defendant's application for permission to appeal, reversed his conviction for aggravated rape holding, among other things that the State had not proven the chain of custody for the pantyhose. *Cannon*, 254 S.W.3d at 287. The Court remanded the case for a new trial. *Id.*

On remand, a second trial on the same charges was held wherein the parties presented the following evidence: Officer Demany Norwood, with the Chattanooga Police Department, testified that, on November 18, 1999, he responded to a call about a rape. He said that he responded to this call, and met with the victim, who was in her "80's" and who was deceased at the time of the trial.

Officer Norwood said that when he responded to the scene, he spoke with the victim to learn the specifics of the attack. She provided details about the rape, including what the rapist did and where in her house the rape had occurred. The victim told the officer that her back was hurting, and the officer noted that the victim supported her back with her hands and was bent over. He further said she appeared "very shaky." Officer Norwood said that he saw a "laceration across [the victim's] forehead." Officer Norwood testified that he called an ambulance for the victim and that she was transported via ambulance to the hospital. The officer then notified detectives about the situation and explained to them what the victim had told him about the crime. During cross examination, the officer said there was no suspect present at the scene when he arrived.

Daryl Whitfield, an employee with the Chattanooga Police Department, testified that he was in charge of the crime scene unit. On November 18, 1999, he responded to a call about a rape. When he arrived, he spoke to the people present and learned that the suspect entered and exited the home through the front door. The officer processed a green chair that was on the front porch of the house. He proceeded to the couch, where the incident occurred, and saw that some couch cushions were either pulled out or thrown out onto the floor. From the area around or on the couch, he gathered a cup, couch cushions, and some black hairs that were on the couch and the floor. Officer Whitfield also processed the area for latent

fingerprints and obtained two latent fingerprints. The officer turned the property over to the property division of the police department for safe keeping.

Officer Whitfield said that police had a "potential suspect," Elijah Wellington, in custody, and he photographed Wellington. The officer identified many of the pictures he took that evening, including one of Wellington, and those pictures were shown to the jury.

During cross-examination, the officer testified that he did not personally find anything related to the Defendant on the items he collected. He gathered the items so that they could be tested at a later time. He said he did not think the victim was present when he arrived at the scene, but he was not certain of this fact.

Brian Ingalls, an emergency room physician at Memorial Hospital, testified that the hospital kept medical records on every patient treated. This record consisted of a recording of the events that occurred during treatment, as documented by both he and the nursing staff. Dr. Ingalls testified that, when a patient arrived at the emergency room, they were met by a triage nurse, who took the information surrounding their complaint. The patient would then be taken to a room, when available, for treatment. The doctor, before entering the patient room, would review the complaint and then meet with the patient for evaluation.

The doctor testified that he had worked in the emergency room for twenty years and that, during that time, he had dealt with medical records on every patient that he had seen. He said that he had a business duty to write on these medical records and that the hospital kept the records in a computer system called Chart Max. If a doctor so chose, he could pull the records by name and review all of a given patient's emergency room treatment records. This was true for each and every patient.

Dr. Ingalls then identified the victim's medical records from November 18, 1999. He identified his signature and the signature of a nurse on those records. He said that he treated the victim for a sexual assault. His records indicated that the victim had a small abrasion to her forehead and lower back pain. Dr. Ingalls noted that a resident was following him at the time and that he allowed the resident to make observations, which he later adopted in the medical record. Those observations included:

[B]ack pain after sexual assault, patient is a healthy 80-year-old white female who was sexually assaulted this afternoon, complains of back pain located in lower back. No shortness of breath[,] [c]hest pain[,] [n]ausea, vomitting.

Dr. Ingalls testified that he did not prescribe treatment for the victim; rather, another doctor, Dr. Stone, ordered a six-pack of pain pills.

Dr. Ingalls testified that treatment rooms in the emergency room were cleaned between each patient to prevent the transmission of germs or viruses. Any traces of blood would also be cleaned up. He had never been aware of a situation where a room was not cleaned between patients. He further testified that, usually, a patient was changed into a hospital gown, if warranted by the patient's main complaint. Patient clothing would then be placed in a hospital bag and left inside the room for storage.

During cross-examination, Dr. Ingalls testified that he did not know who was responsible for gathering patient clothing. He said that the hospital bag in which the patient clothing was placed was made of plastic. He had never seen the items placed in paper bags. The doctor said that "environmental services" was responsible for cleaning the patient rooms between patients.

Ardyce Ridolpho [1] testified that, in 1999, she worked as a nurse practitioner for the Sexual Assault Crisis Center in Chattanooga, Tennessee. Ridolpho testified as an expert in geriatric nursing and also as an expert in sexual assault examinations. She said she was called to Memorial Hospital to examine the victim. She first traveled to the Sexual Assault Center to get the duffle bag containing the items necessary for her examination, including the rape examination kit, and then she went to the hospital. Ridolpho testified about entering the victim's hospital room, noting that the victim was in a private room and was already dressed in a hospital gown. Ridolpho photographed the victim, and the two began to discuss the victim's medical history. Ridolpho noted that the victim appeared "very upset[,]" "shocked, [and] agitated." Ridolpho said the victim was "talking constantly" and also frequently rubbed her head.

Ridolpho testified that she informed the victim that it was time for the physical examination. She said the victim appeared "uncomfortable" and was not able to "move down easily by herself." The victim required assistance due to her pain. Ridolpho examined the victim and found multiple bruises on her face. She had a scab that had come off, causing some bleeding. Ridolpho then performed the pelvic examination and found some wet areas from which she obtained samples. Ridolpho noted some abrasions on the inside of the victim's vagina and also some tears at the back part of her vagina. Ridolpho found blood inside the victim's vagina and also an abrasion that was similar to a rug burn. She opined that there had been "trauma" to the victim's vaginal area. She said that these injuries were consistent with forceful penetration.

---

[1] We note that the Tennessee Supreme Court opinion spells the nurse's name as "Redolpho." Because the transcript of the trial in this case lists her name as being spelled "Ridolpho" we will use that spelling throughout this case.

-4-

Ridolpho testified that she gathered samples from the victim, including a pubic hair combing. Ridolpho said she gathered and photographed the victim's clothing from a hospital bag at the detective's request. She said that, in with the victim's other clothing, were a pair of pantyhose, and Ridolpho believed the pantyhose belonged to the victim. She said the victim had not been wearing underwear and only had been wearing pantyhose. Ridolpho placed the pantyhose, which had tears and were wet, into the underwear bag provided in the rape kit and sealed it for later testing. Ridolpho agreed she never saw the victim actually wearing the pantyhose but said that they were in the hospital bag with the victim's other clothing.

Ridolpho testified that she sealed the rape kit, signed it, and then locked it in the refrigerator at the Sexual Assault Center for the police department to pick up.

During cross-examination, Ridolpho testified that the photograph of the victim's clothing did not include the pantyhose. She explained that she was unsure whether she had already placed the pantyhose in the rape kit at the time she took the picture of the clothing. She said that her protocol included placing wet items into a paper bag. She agreed that the pantyhose, and other clothing, had been placed in a plastic hospital bag before she arrived at the hospital. She agreed that all of the victim's clothing was contained in one bag and not packaged separately. She further agreed she could not testify about the practices used by the person who placed the clothing in the bag.

Royellen Lamar testified that, in 1999, he was a police officer with the Chattanooga Police Department. He said that on December 8, 1999, he picked up the rape kit and brought it to the Chattanooga Police Department to be stored.

Charles Dudley, a Chattanooga Police Department officer in 1999, testified that he was the lead investigator for the victim's rape case. He said that while he was traveling to work on the afternoon of November 18, 1999, he heard the dispatch call about the rape. When he arrived at the victim's home, the victim had already been transported to the hospital. While at the scene, he spoke with Officer Norwood and Inspector Daryl Whitfield, the crime scene technician, and also to two of the victim's neighbors, Beth McGuire and Mike McDaniel.

Officer Dudley testified that one of the neighbors gave him a description of a man who had been "hanging around" the outside of the victim's house. Officer Dudley recounted that a patrol officer brought back a suspect who appeared to match the witness's description. He took the suspect out of the car to photograph him, and witness McDaniel pointed to the man and said "that's the guy, that's the guy I saw." This man was arrested but later ruled out as a suspect based upon DNA evidence.

Officer Dudley said that he then conducted an on-scene investigation based on the information relayed to him by officer Norwood. He walked through the inside and outside of the victim's home. Additionally, the officer spoke with the victim's sister, who gave him an idea of how the crime may have occurred.

Officer Dudley said that he then went to the hospital, where the charge nurse informed him that Ridolpho had just arrived to examine the victim. The officer asked to speak with the victim before the examination began, and he entered the victim's room and spoke to her. He said that the victim was in "obvious" pain and was "cringing" and complaining about severe back pain. Officer Dudley said that the victim was wearing a hospital gown and that her clothing was in a plastic hospital bag that was lying on the counter. The officer said he examined the clothing to see if there was any visible physical evidence on the clothing. He then asked Ridolpho to take a picture of the clothing.

Officer Dudley identified the rape kit that was completed on the victim by Ridolpho. He identified his initials on the kit and said that the other individuals who signed the kit, checking it into and out of evidence, were under a duty to ensure the records on the kit were accurate. Officer Dudley testified that the rape kit was retrieved from the refrigerator at the rape crisis center and taken to the property room in the police department. It was then sent to the TBI for testing.

Officer Dudley testified that, after the TBI returned the test results, the suspect they had in custody was released because his DNA did not match the DNA found on the victim's clothing. Shortly thereafter, the officer learned that the State was starting a CODIS bank, which was a bank of numerous DNA profiles from several different sources. In 2002, the Defendant's DNA from the victim's clothing matched a DNA profile in the CODIS bank. The CODIS laboratory required an additional sample from the Defendant to positively determine the match.

Officer Dudley said he located the Defendant and observed a blood sample being taken from him. The blood sample was then sent to the TBI laboratory for DNA comparison. The comparison matched the DNA profile from the victim's clothing.

Detective Mike Mayo, with the Hamilton County Sheriff's Department fugitive unit, testified that, in April 2003, he traveled to Clifton, Tennessee to arrest the Defendant. When Detective May handcuffed the Defendant, the Defendant asked why he was being arrested. The detective explained the charge in the warrant was for aggravated rape, and the Defendant stated that he did not remember committing that crime. The Defendant then asked how much time he would receive for that charge. Detective Mayo described the Defendant as "pretty calm" about being arrested for aggravated rape.

During cross-examination, Detective Mayo testified that the Defendant never confessed to the rape.

Teresa Weston, a forensic technician supervisor with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, testified that her job duties included ensuring and maintaining the chain of custody for evidence. Weston discussed the procedures used when evidence is accepted by mail. She said that she had reviewed the TBI file records for the evidence received in this case and that it appeared that TBI laboratory polices and procedures were followed. During cross-examination, Weston conceded that she did not participate in the handling of any evidence in this case.

Mike Turbeville, a TBI Special Agent, testified that he was a serologist, meaning that he examined evidence for bodily fluids. If the item contained such evidence, he would then attempt to create a DNA profile from the fluids. Agent Turbeville testified that he tested the sexual assault kit submitted in this case. He said the kit was sealed when he received it, and, inside the kit, each of the respective items was individually sealed. Agent Turbeville said he examined the vaginal swab and did not find the presence of any sperm. The agent said he also tested a pair of pantyhose that was included in the rape kit. He first used a fluorescent light to determine if semen was on the pantyhose, and the light fluoresced on some areas on the pantyhose. He then sprayed the pantyhose with a spray that would turn purplish in color in the presence of semen. The stain showed the possible presence of semen on the pantyhose, so the agent tested them further. Agent Turbeville testified that he confirmed the presence of "spermatoza heads" on the pantyhose.

Agent Turbeville testified that he notified the district attorney that he found DNA on the pantyhose and asked if they had a DNA sample from a suspect that they wanted compared to the DNA he had found. The district attorney requested the testing and offered a blood sample from a suspect, Elijah Ellington. Agent Turbeville testified that he created a DNA profile from the pantyhose and determined that the sperm were from a single male. He also found the victim's DNA on the pantyhose.. He created a DNA profile from the sample of Ellington's blood. The agent compared the DNA profiles of the sperm on the pantyhose with Ellington's blood and determined that the two did not match.

Agent Turbeville testified that in 2000, when he conducted the testing in this case, the TBI laboratory did not have access to the national DNA database, CODIS. In October 2001, the TBI put all the DNA profiles into a state-level database, including DNA profiles from unknown donors that had been obtained from evidence in cases. In February 2002, the TBI laboratory gained access to the national database, CODIS, and uploaded all of their DNA profiles. The agent recalled that CODIS informed him that there was a "hit" on the pantyhose, meaning that the DNA the TBI submitted on the pantyhose matched the DNA

profile of someone in the CODIS database. In order to complete this testing, Agent Turbeville requested that law enforcement agents obtain a fresh blood sample from the suspect, the Defendant. Agent Turbeville then independently verified this match by retesting the suspect's blood, both the old sample from CODIS and also the fresh sample from the suspect, and recreated a DNA profile, which he compared to the DNA profile created from the pantyhose. The agent tested these samples and confirmed that these two DNA profiles were a match to both the sperm fraction and the non-sperm fraction of DNA found on the pantyhose. The agent said the victim's DNA was also present on the non-sperm fraction of the DNA found on the pantyhose. He said that he submitted a report to law enforcement that detailed his findings.

During cross-examination, Agent Turbeville agreed that his report did not contain his findings regarding the non-sperm fraction of the DNA tested.

Based upon this evidence, the jury convicted the Defendant of aggravated rape. The trial court sentenced him as a Range II offender to thirty-five years in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it admitted a TBI report about the victim's pantyhose; (2) the trial court erred when it denied his motion to dismiss the case after the victim died; (3) the trial court erred when it denied his request for a forensic scientist to testify about the procedure for handling evidence and the possibility of evidence contamination; (4) the State failed to establish a sufficient chain of custody for the victim's pantyhose; (5) the trial court erred when it allowed the State to introduce testimony about the emergency room's protocol; (6) a State witness, Nurse Ardyce Ridolpho, was not qualified to testify as an expert; (7) the trial court erred when it determined that the State did not commit prosecutorial misconduct during closing arguments; (8) the trial court erred when it allowed a doctor to testify about the victim's medical records; and (9) he is entitled to relief based upon cumulative error.

### A. TBI Report about Pantyhose

In the second trial, the State introduced evidence in the TBI report that indicated that Agent Turbeville tested the non-sperm fraction of the DNA on the victim's pantyhose and discovered that it contained DNA from two donors, the victim and the Defendant. This evidence was not presented at the first trial. The Defendant asserts that the trial court erred when it admitted the TBI report containing this evidence and all testimony pertaining to this portion of the report because that information "was not produced for the first trial" even

though it was "in the possession of the State during the Defendant's first trial." The Defendant acknowledges the "clean slate" rule for a second trial, but he asks that we limit that rule in this case. The State counters that the Defendant has failed to establish a proper basis for excluding the evidence, and he is, therefore, not entitled to relief.

The Fifth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment Due Process Clause, and provides that no person shall "be subject to the same offense to be twice put in jeopardy of life or limb." Similarly, Article I, Section 10 of the Tennessee Constitution provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb." The double jeopardy guarantee affords three separate constitutional protections against: 1) a second prosecution for the same offense after acquittal; 2) a second prosecution for the same offense after conviction; and 3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 716 (1969); *State v. Mounce*, 859 S.W.2d 319, 321 (Tenn. 1993). In application, these protections forbid retrial of a defendant who has been acquitted and, when a conviction has been set aside because of insufficiency of the evidence, double jeopardy forbids giving the prosecution "another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11 (1978).

When a defendant obtains a new trial through a successful appeal on some basis other than insufficiency of the evidence, double jeopardy does not preclude a retrial of the defendant. *Id.*; *Ball v. United States*, 163 U.S. 662 (1896); *State v. Campbell*, 641 S.W.2d 890, 893 (Tenn. 1982). Further, there is no constitutional provision that prevents retrial after a reversal for legal error. *State v. Harris*, 919 S.W.2d 323, 328 (Tenn. 1996). Our Supreme Court has stated, "[U]pon appellate reversal of a conviction the Government is not limited at a new trial to evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence." *Id.* (citing *Pickens v. State*, 292 Ark. 362, 730 S.W.2d 230, 235 (1987); *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 243 (1957)).

In accordance with the "clean slate" rule, the trial court did not err when, absent a rule of evidence that the TBI report violated, it allowed the State to introduce the TBI report at the second trial, even though the TBI report was not presented at the first trial. The Defendant has offered no argument that the admission of the TBI report violated a rule of evidence; rather, he urges this Court to find that there is an exception to the "clean slate" rule when the prosecutor in the first trial committed prosecutorial conduct. The Defendant cites *State v. David Johnson*, No. W1998-00687-CCA-R3-CD, 2001 WL 278093 (Tenn. Crim. App., at Jackson, Mar. 14, 2001), *perm. app. denied* (Tenn. Oct. 29, 2001), in support of this argument.

In *Johnson*, the trial court declared a mistrial based on the State's improper

questioning of one of their witnesses. *Id*. at *8. The *Johnson* Court stated:

> Considering the interests sought to be protected by the double jeopardy clause, it logically follows that if a defendant requests a mistrial, he gives up the right to a verdict by the empaneled jury. Double jeopardy, it is recognized, does not bar a retrial in that situation. *See United States v. Dinitz*, 424 U.S. 600, 96 S. Ct. 1075 (1976). An exception to this general rule exists, however, in the very limited context wherein prosecutorial misconduct supplies grounds for a defense motion for mistrial, and the misconduct "was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679, 102 S. Ct. at 2091.

*Johnson*, 2001 WL 278093, at *8. The *Johnson* Court held that the conduct on the part of the prosecutor must be "intentional." *Id*. at *9. The Court went on to hold that the record in that case did not prove that the prosecutor "wanted to or needed to goad the defense into requesting a mistrial." *Id*. at *11. The Court concluded, therefore, that double jeopardy did not bar the defendant's retrial.

We conclude that the *Johnson* case is not applicable to the set of facts currently before us, and we also conclude that *Johnson* would not entitle the Defendant to relief. The Defendant in this case is not arguing that double jeopardy should prevent his retrial. This alone makes *Johnson* distinguishable. He asserts, instead, that the State should be barred from admitting the TBI report based upon the alleged prosecutorial misconduct in the first trial. The Defendant has not, however, shown any prosecutorial misconduct in the first trial. In *Johnson*, the record was clear about the alleged misconduct by the prosecutor, and the trial court granted a mistrial based upon that conduct. We have no such evidence before us in this case.

We conclude that the State must follow the constitutional and statutory rules of notification and the rules of evidence when seeking to admit evidence in the second trial. The State, however, is not limited to the evidence presented at the first trial. *See Harris*, 919 S.W.2d at 328.

Importantly, the Tennessee Supreme Court, when remanding this case for retrial, stated that it was "requiring that the State introduce sufficient evidence to reasonably establish a connection between the pantyhose and [the victim]." *State v. Cannon*, 254 S.W.3d 287, 298 n.5 (2008). The State then located and introduced the portion of the TBI report that indicated that Agent Turbeville tested the non-sperm fraction of the DNA on the victim's pantyhose and discovered that it contained DNA from two donors, the victim and the Defendant. We conclude that neither the constitution or any rule of evidence barred the

trial court's admission of this evidence. The Defendant is not entitled to relief on this issue.

## B. Motion to Dismiss Filed After Victim's Death

The victim, who was eighty-two at the time of the rape, died before the Defendant's retrial. The Defendant contends that the trial court erred when it failed to dismiss the charges against him after the victim died. He asserts that the unavailability of the victim violated his right to "call witnesses." He notes that the victim was unavailable at the first trial, based on her dementia and Alzheimer's disease, and that she died before the second trial. The State counters that neither the Defendant's rights pursuant to the Confrontation Clause nor his right to call witnesses was violated, and he is not, therefore, entitled to relief.

### 1. *Crawford v. Washington*

The Defendant cites to portions of the Tennessee Supreme Court's opinion from his first trial, which held that the trial court erred when it admitted the victim's statements to Officer Norwood, Detective Dudley, and Nurse Ridolpho, because the statements violated the Defendant's constitutional rights to confront witnesses.

The Sixth Amendment of the United States Constitution provides that the accused in a criminal prosecution "shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Similarly, article I, section 9 of the Tennessee Constitution provides that, "in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face[.]" Tenn. Const. art. I, § 9. Although the two provisions are worded differently, "this Court has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated." *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006). Currently, *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and this Tennessee Supreme Court has applied *Crawford* to challenges under the Tennessee Constitution as well. *See, e.g., State v. Lewis*, 235 S.W.3d at 136, 142-52 (Tenn. 2007); *Maclin*, 183 S.W.3d at 344-52.

Obviously, one cannot confront a dead witness about his or her hearsay statements. Neither the federal nor the state confrontation clause prohibits the admission of all hearsay declarations by unavailable witnesses. Rather, only "testimonial" hearsay statements by the unavailable witness create the risk of a constitutional violation. *See Davis v. Washington*, 547 U.S. 813 (2006); *Crawford*, 541 U.S. at 68. Thus, the threshold issue for an alleged confrontation clause violation is "whether a challenged statement is testimonial or nontestimonial." *Maclin*, 183 S.W.3d at 345. Where the statements at issue are testimonial

hearsay, the confrontation clause prohibits their admission unless: (1) the declarant is unavailable; and (2) the defendant has been provided a previous opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54; *Lewis*, 235 S.W.3d at 146.

We note that the facts presented at the Defendant's first trial, as summarized by the Tennessee Supreme Court, included the victim's statements about the facts proceeding the rape and circumstances surrounding her rapist's entry into her home. Also admitted were statements the victim made to Officer Dudley and Nurse Ridolpho. In his appeal of this case, the Defendant does not cite any statements admitted by the victim to any of these three witnesses. The record shows that the State repeatedly told their witnesses to testify "without saying anything that would have been said" before asking them if they spoke with the victim or the victim's sister. The victim's account of the events leading to the rape was not presented to the jury during the second trial. The State's case hinged, rather, on the DNA evidence found on the victim's pantyhose, which showed that the contributors were the victim and also the Defendant.

The bar in *Crawford v. Washington* applies only to statements defined by law as testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823 (2006); *Crawford*, 541 U.S. at 53-54; *Lewis*, 235 S.W.3d at 146.. Hearsay is defined as "a *statement*, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c) (emphasis added). We conclude that, in this case, because the State offered no statements made by the victim or any other witness who did not testify, the Defendant's right to confront witnesses against him was not violated.

## 2. Right to Call Witnesses

The Defendant next asserts that this issue is not "a strict 'Confrontation' issue. It is a 'right to call witnesses' issue." He asserts that, at the first trial, the assistant district attorney did not inform the defense attorney until the end of trial that the victim would be unavailable to testify because she suffered from dementia and Alzheimer's disease. He further notes that the victim did not testify at the second trial because she had died of natural causes. The Defendant cites *State v. Flood*, for the proposition that his due process rights were violated by his inability to call the victim as a witness. 219 S.W.3d 307, 315 (Tenn. 2007). The State counters that *Flood* requires that the evidence be available for introduction and, here, the victim was deceased before the trial began. Further, the State notes, the Defendant made no specific allegation about what favorable evidence the victim would have presented.

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution, even if the exclusions comply with rules of

evidence.  *Flood*, 219 S.W.3d at 315-16.  Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony.  *Id.* at 316 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)).  In *Washington v. Texas*, the United State Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.

388 U.S. 14,19 (1967).

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302.  Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process.  *Id*.  So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation," *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006) (citing *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)).  In determining whether an exclusion of evidence rises to the level of a constitutional violation, we consider the following:

> (1) Whether the excluded evidence is critical to the defense;

> (2) Whether the evidence bears sufficient indicia of reliability; and

> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006); *Rice*, 184 S.W.3d at 673; *Brown*, 29 S.W.3d at 434-35.

In this case, the evidence the Defendant says he was deprived of presenting was the testimony of the rape victim, who was unavailable during the first trial based upon her dementia and who was unavailable at the second trial based upon her death. We conclude that the principles of due process do not require that a defendant in a criminal trial have an absolute right to call a victim, when that victim is unavailable by reasons of the victim's death. As previously stated, the right to offer testimony is not absolute. *See Chambers*, 410 U.S. at 302. The State did not offer statements made by the victim during the Defendant's trial, and the trial court did not apply the rules of procedure arbitrarily or disproportionately. Further, the Defendant makes no argument about how, pursuant to the factors enumerated in *Brown*, the exclusion of the victim's testimony rose to the level of a constitutional violation. We, therefore, conclude that the trial court did not err when it allowed the trial to proceed despite the victim's unavailability, and the Defendant is not entitled to relief.

## C. Denial of Forensic Scientist

The Defendant next contends that the trial court erred when it denied his request for a forensic scientist to testify about contamination of evidence and the procedure for handling evidence. The State counters that the trial court did, in fact, grant the Defendant's request but that defense counsel did not seek to introduce such testimony.

Tennessee Supreme Court Rule 13, section 5(a)(1) states:

> In the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases involving indigent petitioners, the court, in an ex parte hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

A trial court's denial of expert services will not be reversed on appeal absent a showing that the trial court abused its discretion. *State v. Barnett*, 909 S.W.2d 423, 431 (Tenn. 1995). "Funding shall be authorized only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services . . . ." Tenn. Sup. Ct. R. 13 § 5(c)(1). In criminal cases, a particularized need "is established when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial." Tenn. Sup. Ct. R. § 5(c)(2) (citing *Barnett*, 909 S.W.2d at 423). Similarly, the Tennessee Supreme Court adopted a two-pronged test to determine whether a defendant has established a "particularized need" for expert services: "(1) the defendant must show that

he or she 'will be deprived of a fair trial without the expert assistance'; and (2) the defendant must show that 'there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation of [the] case.'" *State v. Scott*, 33 S.W.3d 746, 753 (Tenn. 2000) (quoting *Barnett*, 909 S.W.2d at 430).

The Defendant in his brief states, "the trial judge denied the motion [for an expert] because she wanted to 'use someone local.'" The record in this case shows that the trial court held an *ex parte* hearing to determine whether an expert was needed by the defense about evidence collection. The defense attorney asked for the trial court to approve an expert from Virginia. The trial court asked the defense attorney to attempt to find someone locally. A second *ex parte* hearing was held on March 9, 2009, and the defense attorney informed the trial court that she had been unable to locate a similar expert in the local area. The following exchange then occurred:

> [Defense Counsel]: We're asking for someone with an expertise in evidence collection. Because one of the issues that I'm still having to deal with is what the TBI has found. What I've been able to research is because all these items were bundled together prior to Nurse Ridolpho coming in and separating everything that the question about whether or not this evidence . . . the pantyhose should be allowed in, whether they were contaminated or if the DNA in another collection may have been compromised because of the conditions that occurred prior to anybody separating them. I need an expert in that field.

> THE COURT: Alright.

> [Defense Counsel]: I don't have the order now because I knew you were doing some other things. I just wanted to –

> THE COURT: You tried everywhere else. Okay.

> [Defense Counsel]: And I'll put that in the order where all we've looked –

> THE COURT: yeah.

> [Defense Counsel]: – and that way –

> THE COURT: I think the AOC's not going to like this, to tell you the truth. And you might want to get their approval before you pay anybody.

> [Defense Counsel]: Oh, yes, I will do that.

-15-

THE COURT: Because they may say no.

[Defense Counsel] But I did want to show at least what we've done and how we've done it. And we've checked everywhere to see if there was somebody. And then that will put me in a position of where I need to have I think my – I'll probably be filing a motion to suppress based on what my expert tell me. And that that may be determined . . . that's the factor I need to have before I do the order again.

THE COURT: Okay.

[Defense Counsel]: But thank you so much for –

THE COURT: All right.

[Defense Counsel]: Rather than make what I'm giving you an exhibit to this hearing, it's going to be incorporated into the order.

THE COURT: That will be fine.

[Defense Counsel]: Thank you.

On May 21, 2009, Defense Counsel did, in fact, file a motion to suppress but did not cite any information gleaned from the expert.

We conclude that, based on the record before us, it appears that the trial court approved the Defendant's request to hire an expert on evidence collection. The trial court similarly approved the expert specifically requested by the Defendant, offering only a warning that the Administrative Office of the Courts might not approve the expert's fee. Any assertion to the contrary made by the Defendant in his brief is incorrect. The Defendant is not entitled to relief on this issue.

### D. Chain of Custody For Victim's Pantyhose

After the Defendant's first trial, the Tennessee Supreme Court concluded ,"[T]he State failed to establish a chain of custody sufficient to support the admission into evidence of the pantyhose and the DNA analysis of semen found on the pantyhose. Thus, the trial court abused its discretion by admitting this evidence at trial." *Cannon*, 254 S.W.3d at 289. The Defendant states in his brief that he "adopts . . . the [a]nalysis of the Tennessee Supreme Court . . . ." He asserts that there was "no material difference" in the evidence regarding

-16-

chain of custody between the first trial and the second trial. Therefore, he asserts, the State did not "cure" the chain of custody problem, which was the ground upon which his first trial was reversed. The State counters that, during the second trial, the record showed that the pantyhose were in a bag with the victim's other clothing in the victim's hospital room. Further, the pantyhose had the victim's DNA on them. Thus, the State asserts, it presented sufficient evidence that the pantyhose came from the victim.

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987). Under this standard, we will not reverse unless the trial court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997)).

When ruling that the Defendant was entitled to a new trial after his first trial, the Tennessee Supreme Court stated:

Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." As we have previously recognized, it is "'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *Scott*, 33 S.W.3d at 760 (quoting *State v. Holbrooks*, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)). This evidentiary rule is designed to insure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

Professor Neil Cohen and his colleagues have aptly summarized the rule:

The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. In theory at least,

-17-

testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (5th ed.2005) (footnotes omitted). Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. [State v.]*Scott*, 33 S.W.3d [746,] 760 [(Tenn. 2000)]. An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item. *See State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. On the other hand, if the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen et. al., Tennessee Law of Evidence § 901.12, at 624 (3d ed.1995)).

*Cannon*, 254 S.W.3d at 296.

The Supreme Court went on to conclude that the State did not sufficiently establish the chain of custody. *Id.* at 298. It held:

Applying the reasoning of Scott to the facts of this case, we agree with Defendant that the trial court erred by admitting into evidence the DNA analysis of semen found on the pantyhose because the pantyhose were not sufficiently identified as belonging to the victim by a witness with knowledge. While Nurse R[i]dolfo testified that the pantyhose were in the plastic bag, photographic evidence does not support this assertion. The pantyhose do not appear in the photograph taken by Nurse R[i]dolfo after Detective Dudley spread the clothes from the plastic bag onto the counter. Likewise, the pantyhose are not mentioned in either Nurse R[i]dolfo's or Detective Dudley's report. Although Nurse R[i]dolfo claimed that M.N. told her the pantyhose belonged to M.N., the trial court properly excluded this statement.

-18-

*Id.*

At the Defendant's second trial, the chain of custody evidence presented differed from the first trial. Nurse Ridolpho said that she gathered and examined the victim's clothing in accordance with the rape kit. Along with the victim's other clothing, were a pair of pantyhose, and Ridolpho believed the pantyhose belonged to the victim. She said the victim had not been wearing underwear and only had been wearing pantyhose. Ridolpho placed the pantyhose, which were torn and wet, into the underwear bag provided in the rape kit and sealed it for later testing. Ridolpho agreed she never saw the victim actually wearing the pantyhose but that they were in the hospital bag with the victim's other clothing. She conceded that a picture she took of the victim's clothing from the bag did not depict the pantyhose, explaining that she believed she had already gathered them and placed them in the rape kit. A doctor from the hospital testified about the hospital's protocol for cleaning rooms between patients and for removing rape victim's clothing. A TBI agent testified that he performed DNA testing on the pantyhose and found two contributors of DNA to the genetic material found on the pantyhose. His testing proved that the two contributors were the Defendant and the victim. We conclude that these facts and circumstances reasonably establish the identity and integrity of the evidence, *see Cannon*, 254 S.W.3d at 296, and that the trial court did not err when it admitted the pantyhose into evidence. The Defendant is not entitled to relief on this issue.

### E. Emergency Room Protocol

The Defendant next contends that the trial court erred when it allowed the State to introduce testimony about the emergency room's protocol. He asserts that the State informed him that the hospital had no written policies or procedures regarding emergency room maintenance and the collection and packaging of rape victim's clothing. The Defendant states that he filed a motion to suppress evidence about the pantyhose because there was no evidence as to who collected the clothes and no evidence as to whether or not they had been contaminated. At trial, the trial court allowed Dr. Brian Ingalls to testify about the general procedures for cleaning rooms between patient visits and the procedure for handling patient clothing. The State counters that the doctor's testimony was sufficient to establish a regular course of conduct regarding the cleaning of the emergency room, so the trial court properly admitted the evidence pursuant to Rule 406 of the Tennessee Rules of Evidence.

During the Defendant's trial, Dr. Ingalls testified that he had worked in the emergency room for twenty years and that it was the practice of the emergency room doctors at the hospital to treat patients in a sterile and clean room. He said that, in furtherance of this practice, the rooms were cleaned between patients and that he had never seen a patient at the

hospital in a room that had not been cleaned before their admittance. He further testified that, depending on the patient complaint, a patient was changed out of their clothing and into a hospital gown. If this was done, the patient's clothing was placed in a white, plastic hospital bag.

The admission of evidence is a matter within the trial court's discretion, and a decision to admit or exclude evidence will not be disturbed on appeal absent a clear abuse of that discretion. *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999). Rule 401 of the Tennessee Rules of Evidence provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402.

The State contends the doctor's testimony was admissible pursuant to Rule 406 of the Tennessee Rules of Evidence, which provides that habit and routine practice evidence may be relevant. The rule states:

(a) Evidence of the habit of a person, an animal, or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye-witnesses, is relevant to prove that the conduct of the person, animal, or organization on a particular occasion was in conformity with the habit or routine practice.

(b) A habit is a regular response to a repeated specific situation. A routine practice is a regular course of conduct of an organization.

Tenn R. Evid. 406.

The express specification of the admissibility of habit evidence contained in Rule 406 does not serve to limit the more general test of Rule 401, which generally permits the admission of relevant evidence. *See State v. Jimmy Sprague*, No. E2010-00288-CCA-R3-CD, 2011 WL 3329814, at *7 (Tenn. Crim. App., at Knoxville, Aug. 3, 2011) (citing Neil P. Cohen et al., *Tennessee Law of Evidence* 200 (3d ed. 1995) ("Since Rule 406 admits evidence that would probably be admitted anyway under the general relevance principles embraced in Rule 401, it is arguable that Rule 406 adds little new to modern evidence law.")) (other citations omitted). "The key element of proof of either habit or routine practice is extreme regularity." Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.06[6][a] (5th ed. 2005).

We conclude that the trial court did not abuse its discretion when it admitted the

-20-

doctor's testimony. The Defendant's contention at trial was that the pantyhose upon which his DNA was found did not belong to the victim. He argued that the State could not prove who undressed the victim and from where the pantyhose came. To rebut this argument, the State asked the emergency room doctor about the possibility of a hospital room not being cleaned before a patient was treated in that room. The doctor described the hospital's routine practice of cleaning rooms between patients and of treating patients in clean rooms. He stated that in his twenty years working at the hospital he had never treated a patient in a room that had not been cleaned. The evidence, in this case, was evidence of "extreme regularity." The evidence was both relevant and admissible. The fact that there were no written policies and procedures detailing cleaning requirements does not render this evidence inadmissible. The Defendant is not entitled to relief on this issue.

### F. Nurse Ridolpho as an Expert

The Defendant next contends that the trial court erred when it allowed Nurse Ardyce Ridolpho to testify as an expert. He asserts that, at the time she examined the victim, Nurse Ridolpho was not certified as a sexual assault nurse examiner. The State counters that the record evinces that the nurse was, in fact, qualified to testify as an expert in sexual assault.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and no reversal occurs on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

In this case, the Defendant objected to Nurse Ridolpho being admitted as an expert in sexual assault examinations because she did not have a sexual assault certification at the time that she examined the victim. Nurse Ridolpho testified that when she examined the victim on November 19, 1999, she had been a nurse for twenty-seven years. In 1990, Nurse Ridolpho became certified as geriatric nurse practitioner and, since, she had seen thousands

of patients as a geriatric nurse practitioner. In 1994, Nurse Ridolpho received her masters degree in nursing and graduated as a family practitioner. At the time she performed the victim's exam, she was a sexual assault nurse examiner with the sexual assault crisis team, but she did not have a "certification" in that area because no "certification" process existed at the time of the victim's examination. In order to examine patients, however, she had been required to attend twenty-one hours of training and also perform ten sexual assault examinations accompanied by a trained sexual assault nurse examiner. She had been working as a sexual assault nurse practitioner for over a year at the time she examined the victim. In 2002, when it became available, Nurse Ridolpho received her sexual assault nurse examiner certification. A certification she maintained by receiving continuing education credits.

The trial court found that Nurse Ridolpho was an expert. The trial court concluded that, while she did not have a certification at the time of the victim's examination, no such examination existed. Further, the trial court concluded that she subsequently received her certification and could relate back her expertise to her examination of the victim. We conclude that the trial court did not abuse its discretion when it declared Nurse Ridolpho an expert. The nurse, through her testimony, established that she had both training and experience in the field of both geriatric nursing and sexual assault examinations, receiving advanced nursing degrees and a sexual assault certification. Further, procedures used by the nurse in handling evidence she submitted in the rape kit and the results of her sexual assault examination were at issue in the case. Therefore, the State established that her testimony would help the jury understand these issues. As such, we conclude that the trial court did not err when it allowed the nurse to testify as an expert, and the Defendant is not entitled to relief on this issue.

### G. Prosecutorial Misconduct

The Defendant contends that the trial court erred when it allowed the State to present "a misleading argument regarding the commencement of the chain of custody" during closing arguments. The Defendant points to the State's argument that the victim wore the pantyhose to the hospital, they were placed in the hospital bag, and the chain of custody "is what happens after the pantyhose were collected." He objected during closing arguments and asserts on appeal that there was no proof that the pantyhose were worn by the victim to the hospital and that the chain of custody begins immediately after the crime, not after the collection of evidence. The State counters that the prosecutor's comments were based upon reasonable inferences from the record. Further, the State asserts that, even if improper, the comments did not affect the outcome of the trial.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156

(Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Id.* This Court has explained that "[closing] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

This Court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6 (citations omitted).

When an appellate court determines an argument to be improper, "the established test

-23-

for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

In this case, the Defendant asserts that the prosecutor's statements "were not predicated on the evidence, not pertinent, and incorrect." Further, he asserts that the error was not harmless. After reviewing the closing argument by the prosecutor, the Defendant's timely objections, and the arguments on appeal, we conclude that the prosecutor's comments were not made to "intentionally mislead the jury as to the inferences it may draw." *See Goltz*, 111 S.W.3d at 6.

The State's case depended on the fact that the pantyhose belonged to the victim. Likewise, the Defendant's claim of innocence hinged on the State's inability to prove the pantyhose belonged to the victim. Both parties questioned witnesses in accordance with their theory of the case. It is clear from the record that the Defendant's contention was that the State could not prove who removed the victim's clothing at the hospital, that the pantyhose may have been in the hospital room before she entered it, and that the State could not prove that the pantyhose had not been contaminated. When reviewed in context, the prosecutor's comments directly related to evidence in the record that the victim wore the pantyhose to the hospital. We conclude that the prosecutor's argument was a reasonable inference from the fact that one of the two contributors to DNA on the pantyhose was the victim, the other contributor being the Defendant. Accordingly, we conclude that the prosecutor's comments were not improper. The Defendant is not entitled to relief as to this issue.

### H. Victim's Medical Records

The Defendant next contends that the trial court erred when it allowed Dr. Ingalls to testify about the victim's medical records. He notes that, while Dr. Ingalls was an employee of the hospital, he was not the keeper of records. The State counters that the Defendant waived this issue by failing to raise it in his motion for new trial. Further, the State asserts that this issue does not require review pursuant to the plain error doctrine.

Our rules of criminal procedure provide that "[a] motion for a new trial shall be in

-24-

writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "[T]his thirty day period is jurisdictional and cannot be expanded." *State v. Hatcher*, 310 S.W.3d 788, 800 (Tenn. 2010). Thus, "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for a new trial which has not been timely filed." *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004). In *State v. Charles E. Lowe-Kelley*, __ S.W.3d __, No. M2010-00500-SC-R11-CD, 2012 WL 3678073, at *3 (Tenn. Aug, 28, 2012), the Tennessee Supreme Court recently held that a motion that requests a new trial and contains no specific grounds for relief satisfies the requirements of Tennessee Rule of Criminal Procedure 33(b). The Court noted, however, that "A defendant who fails to provide specific grounds for relief in a motion for new trial risks failing to preserve those grounds for appeal." *Id.* at *2 (citing Tenn. R. App. P. 3(e) (providing for waiver of issues not specifically stated in a motion for new trial)).

This Court has previously stated that a defendant's failure to reduce an oral amendment to writing within thirty days of the entry of the sentencing order waives the issue. *See State v. Ronald Lee Stewart*, No. M2008-00337-CCA-R3-CD, 2010 WL 2025407, at *4 (Tenn. Crim. App., at Nashville, May 21, 2010); *State v. Mark C. Noles*, No. M2006-01534-CCA-R3-CD, 2007 WL 3274422, at *11 (Tenn. Crim. App., at Nashville, Nov. 6, 2007); *State v. Ronnie Watson*, No. W2001-03084-CCA-R3-CD, 2002 WL 31258011, at *1-2 (Tenn. Crim. App., at Jackson, Sept. 16, 2002); *State v. Christopher D. Lanier*, No. W2001-00379-CCA-R3-CD, 2002 WL 1482712, at *4 (Tenn. Crim. App., at Jackson, Feb. 1, 2002).

In the case presently before us, the judgment of conviction was entered November 29, 2010. On December 29, 2010, the Defendant filed a motion for new trial, alleging that the evidence was insufficient to sustain his conviction. On September 16, 2011, the Defendant filed an amended motion for new trial, which listed several grounds for relief. The amended motion for new trial did not include the issue of whether the trial court erred in admitting the medical records through Dr. Ingalls. The trial court denied the motion for new trial on November 7, 2011. We conclude that the Defendant has waived our review of this issue by failing to reduce the issue, which he raised orally, to writing.

This Court may, however, consider errors affecting the substantial rights of the defendant if review is necessary to do substantial justice. Because, according to Tennessee Rule of Appellate Procedure 13(b), "[r]eview generally will extend only to those issues presented for review," we must review the issue presented by the Defendant herein pursuant to Tennessee Rule of Appellate Procedure 36(b), which states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We refer to this discretionary consideration of waived issues as "plain error" review. *See Grindstaff v. State*, 297 S.W.3d 208, 219 n.12 (Tenn. 2009). A

court will grant relief for plain error pursuant to Rule 36(b) only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake." *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id*. The party claiming plain error has the burden of persuading the appellate court. *State v. Banks*, 271 S .W.3d 90, 119 (Tenn. 2008).

The record reflects, however, that the Defendant presented this issue during the hearing on the motion for new trial, and the State did not object. The trial court allowed the Defendant to proceed on the issue; although, it ultimately denied the Defendant's motion for new trial. While, as previously stated, the Defendant waived our review of this issue, we will review the argument under plain error review, pursuant to Tennessee Rule of Appellate Procedure 36(b).

The victim's medical records are considered hearsay. Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial except as provided by the rule of evidence or otherwise by law. Tenn. R. Evid. 802. The trial court in this case admitted the records pursuant to the business records exception to the hearsay rule. *See* Tenn. R. Evid. 803(6).

That rule provides for the admissibility of:

> A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used on [sic] this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

*Id.* The purpose of this rule "is to facilitate the use of business records by eliminating the expense and inconvenience of calling numerous witnesses involved in the preparation and maintenance of the records." *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995).

In order to be admitted under Rule 803(6), the proffered documents must meet the following five requirements:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Alexander*, 903 S.W.2d at 700. Additionally, the rule requires that the foundation for admission of the proffered documents be provided by the custodian or other qualified witness. Tenn. R. Evid. 803(6).

Our Court of Appeals has previously held that:

[t]he term "qualified witness" should be given a broad interpretation. To be considered qualified, a witness must be personally familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures. The witness is not required to have personal knowledge of the facts recorded, to have been involved personally in the preparation of the records, or even to know who actually recorded the information.

*Alexander*, 903 S.W.2d at 700 (citations omitted).

We conclude that the trial court's admission of the victim's medical records through Dr. Ingalls did not breach an unequivocal rule of law. *See Hatcher*, 310 S.W.3d at 808. Dr. Ingalls had worked as an emergency room physician at the hospital for more than twenty years. He understood the intake procedures for creating a medical record for a patient, and he had reviewed the medical records of each patient that he saw at the hospital. He noted that he had a business duty to maintain a patient record by documenting his course of treatment for each patient in the record. In our view, the admission into evidence of the victim's

medical records through the testimony of Dr. Ingalls was not error. The Defendant is not entitled to relief on this issue.

## I. Cumulative Error

Lastly, the Defendant contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the Defendant's issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the evidence supports the Defendant's conviction, the trial court committed no evidentiary errors, and that the State did not commit prosecutorial misconduct. We, therefore, affirm the Defendant's conviction.

_____
ROBERT W. WEDEMEYER, JUDGE